IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re:<br><br>John M. Hargrave,<br>Laura A. Hargrave,<br><br>               Debtors,<br>_____<br><br>John M. Hargrave,<br>Laura A. Hargrave,<br><br>               Plaintiffs,<br><br>     vs.<br><br>Educational Credit Management Corp. (ECMC);<br>United Student Aid Funds (USAF); Navient<br>Solutions LLC; *and* U.S. Department of<br>Education.<br><br>               Defendants. | Case No. 17-21306-rdb<br>Ch. 13<br><br><br><br>Adv. Case 22-06042 |

## PLAINTIFFS' TRIAL BRIEF

COME NOW Plaintiffs, by and through attorney Phillips & Thomas LLC, in accordance with LBR 9013.1, and hereby submit their trial brief in the above-entitled action.

1

## I. STATEMENT OF THE MATTER BEFORE THE COURT

This is an adversary proceeding brought pursuant to 11 U.S.C. §523(a)(8) to determine the dischargeability of student loan debt. The Plaintiffs are former Chapter 13 debtors who contend that their current circumstances satisfy the dischargeability requirements of the *Brunner* test as modified by the Tenth Circuit and Kansas case law. Because paying their student loans would impose an undue hardship on the Plaintiffs, their student loans should be discharged in whole or in part.

## II. STATEMENT OF RELEVANT FACTS

The following statements of relevant fact are supported by the documents in the record of this case, which are attached to this brief as exhibits. The attached exhibits are either deposition exhibits (Exh. 1) or are documents in the record of the Plaintiffs' Chapter 13 case (Exh. 2, 3, 4).

Plaintiffs are a married couple living in Sedgwick County, Kansas. John M. Hargrave is 51 years old, and Laura A. Hargrave is 56 years old (Exh. 1, p. 1). The total amount of their student loan debt is estimated at $329,190 (Exh. 1, p. 2). The loans were incurred over a span of years at different educational institutions from the early 1990s to 2013 (Exh. 1, p. 2-3). At the time of writing of their "Attestation Form" (January 2023), the Hargraves' current monthly household income from all sources is $8,868.00 (Exh. 1, p. 6). Their monthly payroll deductions are as follows (Exh. 1, pp. 9-10):

**Taxes, Medicare and Social Security**: $1,464.72

**Contributions to retirement accounts**: $0 (John Hargrave makes none, and Laura Hargrave has no retirement account)

2

**Life insurance**:  $109.80

**Health insurance**:  $605.68 ($151.42 per week)

**Club dues**:  $27

The Hargraves' monthly expenses are as follows:

**Food**:  exceeding $779

**Housekeeping supplies**:  $82

**Apparel & services**:  $161

**Personal care products & services**:  $82

**Uninsured medical costs (debtors have ongoing and major medical conditions)**:  exceeding $75

**Miscellaneous expenses**:  exceeding $306

**Mortgage or rent payment**:  $972.04

**Home maintenance & repair**:  $75

**Utilities**:  $745

**Vehicle payments**:  $640 total.  Laura Hargrave's car payment is $280 (a Nissan Rogue with current loan balance of $15,641.08), and John Hargrave's car payment is $360.

**Monthly cost of operating vehicles (gas, maintenance, insurance):**  $640

**Life insurance**:  $116

**Payments on delinquent tax debt**:  $78/mo. to Kansas, $50/mo. to IRS (which will soon increase to $100/mo.)

**Church tithes**:  At time of writing of Attestation Form, debtors listed tithing of around $745/mo. Debtors currently tithe only 2% of their gross income, or about $100 to $150

**Payment to Synchrony Bank**:  $205 (this is a loan payment for roof repair, with loan balance of $8,362.06)

**Entertainment**:  $155

3

**Best Egg personal loan**: $270 currently, but will increase in 11/2024. This was a consolidation loan for medical bills, with balance of $17,875.87.

**Pet care**: $150

**Clothing**: $150

**Medicine & prescriptions**: $50

**Medical/dental**: $300

See Exh. 1, pp. 10-12. After deducting the Hargraves' monthly expenses from their household monthly income, they have no remaining disposable income (Exh. 1, p. 12). The Hargraves' Chapter 13 plan called for the student loan creditors "to receive all of the dividend owed to the class of general unsecured creditors" (Exh. 2, p. 11).

The Hargraves received a discharge in their bankruptcy case on August 29, 2022 (Exh. 3). During their bankruptcy case, the Hargraves paid a total of $12,457.11 to their student loan creditors (ECMC, Navient, USAF, U.S. Dept. of Education) (Exh. 4). The Hargraves estimate that they have paid an approximate total of $17,052 since receiving the loans (Exh. 1, p. 16). Debtors have had multiple layoffs over the loan period (Exh. 1, p. 17, 19). The Hargraves income picture is not going to increase in the future (Exh. 1, p. 19).

### III. QUESTION PRESENTED

The question presented by this case is whether the Hargraves have met the standard for dischargeability of their student loans under the Tenth Circuit's modified *Brunner* test.

### IV. ARGUMENT AND AUTHORITIES

It is well known that the Tenth Circuit employs the *Brunner* standard in student loan discharge adversary proceedings. This standard was expanded by the *Polleys* court in 2004.[1] Furthermore, the concept of partial discharge of student loans is now firmly established in Kansas student loan discharge litigation.[2] Since 2016, there have been four Kansas cases in which courts granted partial discharge of student loans. Three of these were appealed, and all of them were upheld.[3] The case law demonstrates that Kansas bankruptcy courts, perhaps in contrast to some other jurisdictions, have deployed a common-sense, reasonable, and humane approach to student loan discharge litigation. By not rigidly fixating on student loan discharge cases as "all or nothing" propositions, Kansas courts have been able to craft flexible and rational solutions, as the Bankruptcy Code intended.

**A. The *Brunner* Factors**.

The Court is familiar with the *Brunner* factors. They are: (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to *repay* the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.[4] We will examine each of these factors as they apply to the Hargraves' situation.

**1. Maintaining a minimum standard of living while repaying the student loans**

---

[1] *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1307 (10th Cir. 2004).
[2] Partial discharge was first recognized by the Tenth Circuit in *Alderete v. Educ. Credit Mgmt. Corp. (In Re Alderete),* 412 F.3d 1200, 1205 (10th Cir. 2005).
[3] *Goodvin v. U.S. Dept. of Education et. al. (In Re Goodvin),* Adv. No. 19-5105, 2020 WL 6821867 (Bankr. D. Kan. Sept. 1, 2020), aff'd sub nom. *Educ. Credit Mgmt. Corp. v. Goodvin*, No. 20-1247-JWL, 2021 WL 1026801 (D. Kan. Mar. 17, 2021); *Metz v. Educ. Credit Mgmt. Corp. (In Re Metz),* 589 B.R. 750 (Bankr. D. Kan. 2018), aff'd sub nom. *Educ. Credit Mgmt. Corp. v. Metz*, No. 18-1281-JWB, 2019 WL 1953119 (D. Kan. May 2, 2019); *Murray v. Educ. Credit Mgmt Corp. (In Re Murray),* 563 B.R. 52 (Bankr. D. Kan. 2016), aff'd sub nom. *Educ. Credit Mgmt Corp. v. Murray*, No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017); *Loyle v. U.S. Dept. of Education et. al. (In Re Loyle),* Adv. No. 20-5073, 2022 WL 567724 (Bankr. D. Kan. 2022).
[4] See., e.g., *Goodvin* at *6.

5

Case 22-06042    Doc# 53    Filed 01/26/24    Page 5 of 14

We note here that the standard here is not "maintaining a minimum standard of living while entering an income-based repayment plan," but "maintaining a minimum standard of living while *repaying* the student loans." A minimal standard of living generally refers to the ability to provide for the necessities of life—those things that are minimally necessary for the debtors and their dependents' care, including food, shelter, clothing, and medical care.[5]

A minimal standard of living does not require living in poverty.[6] The *Murray* court enunciated a list of items that encompassed a minimal standard of living.[7] Both John and Laura Hargrave are employed, and have worked consistently. They do have significant medical costs and expenses, and these are only going to increase over time. But they are both in their 50s, and have almost certainly passed the apex of their earning potentials. Their monthly budget, as described above, does not include any frivolous expenses that would not be necessary for a minimal standard of living.

It is a common practice for creditors in student loan cases to nitpick at the budgets of debtors in an attempt to shave off supposedly excessive expenses here and there. The goal of this sort of budgetary carping is to argue the existence of "disposable income" that could be used to make a payment to an "income-based repayment plan." The absurdity of this argument becomes apparent when we consider the colossal size of the student loans at issue. The loans are in excess of $330,000, and growing. The Hargraves are currently in their 50s, and do not have more than a decade, give or take a few years, of income-earning ability left. No amount of budget tweaking is going to make a significant difference in paying off the loan balance. Indeed,

---

[5] *Loyle* at *8.
[6] *Murray*, 563 B.R. at 58.
[7] *Id*.

the *Goodvin* court's frustration with these types of creditor arguments led it to adopt unusually pungent language, stating that "this student loan case fits the definition of insanity."[8]

**2. Additional circumstances exist with the Hargraves' situation that are likely to persist**

In the Attestation Form which the Hargraves submitted to the U.S. Department of Education in January 2023, they stated as follows:

> John is 50 years old and has a limited amount of years to generate income from employment. In addition, the industry he is employed in has frequent layoffs therefore making employment unstable. He has been laid off five times in the past 24 years. Laura is 55 years old and has a limited amount of years to generate income from employment. Her hours were just recently cut from 40 to 30 per week due to lack of work and it's not anticipated to go back to work to 40, if anything, they will be cut again or she will be completely let go due to lack of work. She has applied for other positions, but believes that due to her age, is getting overlooked for younger applicants….[9]

The Hargraves go on to say that John Hargrave was "diagnosed with coronary atherosclerosis within the past few years & has issues with a bulging disc in his back & these could potentially cause issues in the future, interfering with his employment & ability to generate income." Mr. Hargrave was hospitalized in December 2023 for a serious atrial fibrillation. He has heart disease, and is currently taking two cardiovascular medications. He has had knee surgery, and is going to need knee replacement. It is clear that, due to the Hargraves' aging and health factors, their current situation is going to persist for the foreseeable future.

It should be noted here also that the Hargraves do not have the ability to make any provision for their retirement. They have not been able to set anything aside to help secure them in their old age once their working years are behind them. Laura Hargrave has no retirement account, and John Hargrave does not have the ability to make contributions to a retirement

---

[8] *Goodvin* at *1.
[9] See Exh. 1, p. 15.

account. The public interest is not served, and it is certainly not reasonable, to expect debtors to remain destitute in their old age.

### 3. The debtors have made good faith efforts to repay the loans

Under the third prong of *Brunner*, we must assess the debtors' efforts to secure and maintain employment, as well as maximize their income and minimize their expenses.[10] There is no doubt that the debtors have always been employed and did not create their current hardship by deliberately failing to secure employment. Although John Hargrave experienced periods of layoffs from work, this was not due to his conduct, but was in the nature of his job; and in any case he quickly returned to work.

As in the 2016 case of *In Re Murray*,[11] this is not a situation where the debtors are failing to reach their full earning potential. Nor are they trying to discharge their student loan debt right after graduation. The debtors have been out of school for many years, working and trying to live their lives. A creditor might, with the benefit of hindsight, question the prudence of pursuing degrees in religious studies, but this is not the test of good faith for an undue hardship discharge.[12] The *Pollys* court made it very clear that good faith is not to be used "as a means for courts to impose their own values on a debtor's life choices."[13]

In point of fact, the debtors' conduct over the past five years is revealing of their good faith efforts to pay as much as they could towards their student loans. They filed Chapter 13 bankruptcy in 2014 in 2017 and stayed in it for five years, receiving their discharge upon completion of their plan. They deliberately crafted their Chapter 13 plan to pay *all of their*

---

[10] *Loyle* at *9.
[11] *Murray v. Educ. Credit Mgmt Corp. (In Re Murray),* 563 B.R. 52 (Bankr. D. Kan. 2016), aff'd sub nom. *Educ. Credit Mgmt Corp. v. Murray*, No. 16-2838-CM, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).
[12] Loyle at *10.
[13] *Pollys*, 356 F.3d at 1310; see also *Loyle* at *10.
8

*general unsecured creditor dividend* to their student loan creditors.[14] They did not have to do this, but wanted to do it, in order to give their student loan creditors as much as possible for five years. The student loan creditors received $12,457.11 during the Chapter 13 case; the Hargraves estimate that, with pre-bankruptcy payments added, they made about $17,052 in payments. All that could have been paid on the student loans, was in fact paid.

In addition, we should note here that there is no "minimum payment" amount that applies to the good faith analysis. None of the Kansas student loan cases cited herein made any hint that a minimum amount of money had to be paid towards student loans in order to find good faith. In fact, bankruptcy courts have explicitly found that a debtor acted in good faith in spite of making few loan payments, or no payments at all.[15]

### B. Income-Based and Income-Driven Repayment Plans (IBRs or IDRs)

It is important to say something here about the various "income based repayment plans" (or "income driven repayment plans" or IDRs) frequently pushed by student loan creditors as ways of avoiding the implications of a rational *Brunner* analysis under Kansas case law. While it is true that the availability of IDRs (such as the Orwellian-named "REPAYE" plan) is a factor in the good faith analysis,[16] Kansas courts have given the availability of such plans very little weight since the *Murray* decision in 2016. In *Murray*, the court rejected the availability of a

---

[14] See Exh. 2.
[15] See, e.g., *Clavell v. U.S. Dept. of Education*, Adv. No. 16-01181 (Bankr. S.D.N.Y. Feb. 7, 2020) (Debtor made no payments for 10 years); *Trejo v. U.S. Department of Education*, Adv. No. 17-4052, 2020 WL 1884444 (N.D. Tex. Apr. 15, 2020) (Debtor had no ability to pay); *Mudd v. U.S. Dept. of Education*, Adv. No. 19-04048, 2020 WL 7330054 (Bank. D. Neb. Dec. 9, 2020) (Debtor had no disposable income to make payments); *Hill v. Educ. Credit Mgmt. Corp.*, 598 B.R. 907 (Bankr. N.D. Ga. 2019) (Debtor had no ability to make payments); *Roth v. Educ. Credit Mgmt. Corp.*, 490 B.R. 908 (BAP 9th Cir. 2013) (Debtor in her 60s had acted in good faith despite making no payments).
[16] *Goodvin* at *10.

9

minimal payment under an IDR plan, correctly observing that the IDR plan would do little or nothing to pay off the loan.[17]

In fact, enrollment in an IDR plan is not required to satisfy the good faith prong of the *Brunner* test.[18] None of the recent Kansas decisions cited in these pages—*Murray*, *Loyle*, *Metz*, and *Goodvin*—had anything good to say about IDRs. In fact, the courts in these cases went out of their way to note that participating in such plans was an exercise in futility. The inescapable fact is that, as the *Murray* court noted, the key issue is whether the debtor can maintain a minimal standard of living if required ***to repay the loan***, not whether the debtor has a surplus in her budget to make a monthly IDR payment.[19]

IDRs have at least three fatal problems. First, a high percentage of people entering them will never pay off their student loans. Second, those able to complete IDRs will have their loan balances forgiven, but this forgiven amount is taxable income unless they happen to be insolvent. Third, as numerous federal courts have recognized, IDRs lock borrowers into long-term indebtedness, putting them under unremitting emotional and psychological stress. The fundamental irrationality of shoveling debtors into IDRs was noted by a Kansas district court when it made this pointed observation:

> ECMC [the appealing student loan creditor] is assuming that Metz will not have any significant assets at the time her debt would be forgiven [in an IDR]. Under current law, "forgiveness of a student loan at the end of the IBRP period is taxable in the same way as forgiveness of any other debt outside bankruptcy. That is, to the extent a debtor's assets exceed liabilities after the forgiveness, the forgiven debt is taxable income." *In Re Murray*, 563 B.R. 52, 60 (Bankr. D. Kan. 2016), aff'd sub nom. *Educ. Credit Mgmt. Corp. v. Murray*, No. 16-2838, 2017 WL 4222980 (D. Kan. Sept. 22, 2017). The import of that argument is that under

---

[17] *Murray*, 563 B.R. 52, 60.
[18] *Id*. at endnote 64.
[19] *Murray* at 60; see also *Metz*, 589 B.R. 750, 759 (rejecting the availability of IDRs when the student loans could not be repaid while maintaining a minimum standard of living).

10

ECMC's plan, the debtor will be kept insolvent, if not entirely, impoverished, until she is eighty years old and the debt is forgiven—what a pleasant system.[20]

The bankruptcy court in *Metz* was also troubled by the suggestion of the IDR "option," noting correctly that "[t]he cancellation of this debt could result in Ms. Metz realizing up to $152,277.88 in cancellation of debt income in the tax year the debt is forgiven. This could generate considerable tax liability for a retired 84-year-old living on social security."[21] The court in *Loyle* expressed a similar view: "Nor is requiring the Loyles to remain in such repayment plans for 25 years a satisfactory answer. Compelling that for 25 years to achieve forgiveness of an even greater loan balance, when Dr. Loyle will be 74 and Ms. Loyle will be 68, hardly seems like a fresh start from their 2019 bankruptcy. The Court applies the *Brunner* test such that debtors who truly cannot afford to repay their loans may have some or all of their loans discharged."[22]

Clearly, IDRs like REPAYE serve no purpose when the amount of student loan debt is so large that paying it off is impossible—a situation that evokes the *Goodvin* court's comment about "the definition of insanity."[23] IDRs defeat the Bankruptcy Code's fresh start policy by saddling participants with imputed income tax debt (unless of course they are insolvent), and by placing them under significant stress for years. The emotional burden of long-term indebtedness was discussed at length in the 2016 case of *Fern v. FedLoan Servicing*.[24] In *Fern*, the court took note of the emotional burden that the student loan debt was placing on the debtor, especially when it was clear that the loans would never be paid off. The court would not ignore a hardship "simply

---

[20] *Educ. Credit Mgmt. Corp. v. Metz*, No. 18-1281-JWB, 2019 WL 1953119 (D. Kan. May 2, 2019) at footnote 7.
[21] *Metz*, 589 B.R. at 759.
[22] *Loyle* at *12.
[23] *Goodvin* at *1.
[24] 553 B.R. 362 (Bankr. N.D. Iowa 2016), aff'd 563 B.R. 1 (BAP 8th Cir. 2017).

11

because it is not reflected on a balance sheet."[25]  Courts have also taken note of the toll that long-term student loan debt can place on a marriage.[26]

### C. Tithing And Charitable Contributions

The Hargraves tithe to their local church.  At the time they filled out their "Attestation Form," they indicated a tithing amount of $745 (See Exh. 1, p. 12).  With an average monthly income of $8,868, the tithing percentage comes to approximately 8.4% of their gross income.  Their income has gone down since the Attestation Form was submitted.  Currently, at the time of writing of this brief, the Hargraves are only tithing about 2% of their gross income, which is about $100 to $150 per month.  It is anticipated that the defendants in this case will cry foul, and claim that the debtors' religious contributions should be devoted to student loan payments.

The defendants would be incorrect on this point.  Such tithing is not unreasonable, and is in fact permitted by both statutory and case law.  The Religious Liberty and Charitable Donation Protection Act of 1998 (RLCDPA) amended several provisions of the Bankruptcy Code to protect contributions to religious or charitable organizations by debtors.[27]  Subparagraph (A) of §548(a)(2) prevents a trustee from avoiding transfers to such religious or charitable contributions if the amount of the contribution was not more than 15% of the debtor's gross income.  Subparagraph (B) of the same code section prevents a trustee from avoiding such transfers even if they exceed 15% of the debtor's gross income, provided the contributions are consistent with the debtor's regular practices.[28]

Debtors' religious contributions are well below the 15% threshold established by the RLCDPA and by 11 U.S.C. §548(a)(2).  The Bankruptcy Code provides a "safe harbor" for

---

[25] *Fern*, 553 B.R. at 370.
[26] See, e.g., *In Re Halverson*, 401 B.R. 378, 388 (Bankr. D. Minn. 2009).
[27] *In Re Lewis*, 401 B.R. 431, 435 (Bank. C.D. Calif. 2009).
[28] 11 U.S.C. §548(a)(2)(A) and (B).

religious donations as long as those donations do not exceed 15% of a debtor's gross income.[29] The Tenth Circuit has also addressed this issue and found no problem when the contributions are below 15%: "The statute establishes a bright line rule—donations not exceeding 15% of GAI [gross adjusted income] are protected; donations exceeding 15% are not."[30]

Debtors make their tithing contributions to the Calvary Bible Church in Wichita, Kansas. Religious tithing is part of their lives. They received a religious education (studying theology in college), and have tithed for many years. They tithed before filing for bankruptcy, and resumed doing it after their bankruptcy. It was not something they just started doing recently. It should be noted that, as of the time of writing this brief (January 2024), the debtors only have the financial resources to contribute about 2% of their gross monthly income to their church. Regardless, the case law of the Tenth Circuit and the debtors' prior habits show that their religious contributions have always been reasonable.

## V. CONCLUSION

The foregoing facts and legal arguments demonstrate that the Hargraves' situation satisfies the dischargeability prongs of the *Brunner* test, as those factors have been interpreted by the most current Kansas case law. Their student loan debts should be discharged, so that they can begin the fresh start promised by the Bankruptcy Code.

WHEREFORE, Plaintiffs submit their trial brief.

Respectfully Submitted,

---

[29] *In Re McGough*, 737 F.3d 1268, 1277 (10th Cir. 2013).
[30] *Id*.

                                                 Phillips & Thomas LLC

                                                 By: /s/ George J. Thomas #19230
Phillips & Thomas, LLC
5251 W. 116th Place., Ste. 200
Leawood, KS 66211
Phone: (913) 385-9900
Email: geojthomas@gmail.com

## Certificate of Service

     I hereby certify that on 1/26/2024, the above document was filed electronically in the US Bankruptcy Court for the District of Kansas, thereby serving the Defendants by electronic service.

/s/ George J. Thomas
Counsel for Plaintiffs